COMMONWEALTH of Pennsylvania,
Appellee

v.

Trayvon Nmn JOSEPH, Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 12, 2011.

Filed Dec. 20, 2011.

Reargument Denied Feb. 24, 2012.

Michael Halkias, Public Defender, Carlisle, for appellant.

Matthew P. Smith, Assistant District Attorney, Carlisle, for Commonwealth, appellee.

BEFORE: DONOHUE, LAZARUS and FITZGERALD*, JJ.

OPINION BY DONOHUE, J.:

Appellant, Trayvon Joseph ("Joseph"), appeals from the judgment of sentence entered on November 30, 2010, following his convictions for persons not to possess, use, manufacture, control, sell, or transfer firearms, 18 Pa.C.S.A. § 6105(c)(2), and firearms not to be carried without a license, 18 Pa.C.S.A. § 6106(a)(1). For the reasons that follow, we conclude that the trial court erred in denying Joseph's motion to suppress evidence, and therefore vacate the judgment of sentence and re-

mand for further proceedings consistent with this decision.

On January 27, 2010, Pennsylvania State Police Troopers Yingst and Rudella were patrolling Interstate 83 in Cumberland County. N.T., 8/6/10, at 9. They spotted Joseph's vehicle enter the interstate travelling at 76 miles per hour in a 55 miles per hour zone, and also observed him crossing the fog line several times. *Id.* at 9–10. Trooper Yingst suspected Joseph of driving under the influence and initiated a traffic stop based on the speeding violation. *Id.*

Upon approaching Joseph, Trooper Yingst asked him from where he was coming, to which Joseph asked "what the F does it matter where I'm coming from?" *Id.* at 21. Joseph then answered that he was returning home after going to get gas, but upon further questioning he indicated that he was returning home after purchasing a sex pill and a cappuccino from a local gas station. *Id.* at 22. No evidence of these purchases was visible in the car, but Joseph explained that he had already thrown away the cappuccino cup and pill wrapper. *Id.* at 22–23. Joseph stated that he had also ingested the sex pill and that his girlfriend was at home waiting for him to return. *Id.* at 23.

In addition to what he perceived as inconsistent and unsatisfactory responses to his questions, two more items aroused Trooper Yingst's suspicions. First, Trooper Yingst testified that Joseph had entered the interstate from the Hall Manor, Allison Hill area, known for "very high drug trafficking." *Id.* In this regard, Trooper Yingst initially testified that he believed that Joseph entered the interstate from the 19th Street exit, *id.* at 9, but later at the same evidentiary hearing (while still on direct examination) Trooper Yingst testi-

* Former Justice specially assigned to the Superior Court.

fied that he could not remember whether Joseph had entered from the 13th Street or 19th Street exit. *Id.* at 23. Asked again at trial, Trooper Yingst similarly testified that "it was either 13th Street or 19th Street—I can't be sure." N.T., 9/27/10, at 30.

Second, Trooper Yingst spotted four types of potential drug paraphernalia in Joseph's vehicle: (1) a number of air fresheners hanging from the rear view mirror; (2) a small burlap bag of potpourri on the dash near an air vent; (3) bars of soap on the back seat; and (4) a wrapped "blunt" cigar on the passenger seat. N.T., 8/6/10, at 24–26. Finally, after returning to his vehicle to write out a warning card for Joseph, Officer Yingst ran a record check and found that Joseph had a "significant drug history," including charges for possession and possession with intent to deliver. *Id.* at 28.

After discussing his suspicions with Trooper Rudella, Trooper Yingst returned to Joseph's vehicle and asked him to step out so that he could explain the warning notice being issued. *Id.* at 29. After explaining the warning notice, Trooper Yingst told Joseph he was free to go. *Id.* at 30–31. At that point, the two men disengaged and began walking towards their respective vehicles, but Trooper Yingst turned around and asked Joseph if he would mind answering some more questions. *Id.* He then asked Joseph if he was transporting any amount of drugs (marijuana, cocaine, or heroin), weapons (guns or knives), or large sums of money. *Id.* at 31.

In response, Joseph's level of agitation began to rise and he called Trooper Yingst a "fucking racist." *Id.* At the suppression hearing, Trooper Yingst testified as follows regarding what happened next:

Q. After [Joseph] called you an F-ing racist, what did you respond, what did you say?

A. I told him that I am not a racist. I said, you know, there was [*sic*] just some things in his vehicle that draw [*sic*] my attention. I explained to him, you know, the things that I observed. He said, you know, that I had no probable cause to search his car, I had no reason, you know, to think that he was doing anything illegal. And he said, yeah, pretty much that I was a racist again.

Q. Then he denied you permission for the—

A. And he denied me consent, so.

Q. What did you do then?

A. I told him that was fine. I said, you have that right to deny me consent to search, I said, however, I said, based upon my views and the reasonable suspicion that you are transporting illegal items within that vehicle, I said, I am going to, you know, keep the vehicle here, apply for a search warrant. If that search warrant gets granted, I'm going to search it.
He said, you are not getting in that fucking vehicle. Those were his exact words. He kept saying it over and over again. Every time I was talking he said, you know—I mean, he didn't curse every time, you know, but it was either, you are not getting in that vehicle or you are not getting in that fucking vehicle.

*Id.* at 32–33.

Trooper Yingst then advised Joseph that he was free to leave—that he could "either call for a ride or you could walk off the highway,"—but that his vehicle would remain pending an application for a search warrant. *Id.* at 33. According to Trooper Yingst, Joseph continued to protest, "throwing his arms in the air, putting his

hands in his pockets," while continuing to deny that probable cause existed for searching the car. *Id.* Joseph's level of agitation continued to rise, so Troopers Yingst and Rudella pulled out their tasers—at which point Joseph ran away, crossing the interstate after jumping a barrier. *Id.* at 34. Trooper Yingst denied that either trooper had pointed their tasers at Joseph. *Id.* at 35. The troopers initially gave chase, but soon stopped after remembering that they had advised that he was free to go. *Id.* at 36.

In running from the scene, Joseph had left his vehicle, locked and still running, on the side of the interstate less than 12 inches from the fog line. Trooper Yingst determined that it would be necessary to call a towing company to remove the vehicle. *Id.* When the tow truck operator arrived and unlocked the doors, Trooper Yingst conducted what he described as an inventory search. *Id.* at 37–38. Upon opening the passenger's side rear door, he observed a jacket on the floor, and upon its removal discovered a "shinny [*sic*] silver handgun," loaded with a bullet in the chamber. *Id.* at 39–40. After unloading the weapon, Trooper Yingst walked to the driver's side of the vehicle, at which time he discovered a small bag of marijuana (less than 28 grams) lying on the ground outside of the vehicle. *Id.* at 37, 40.

Suspending the inventory search at that time, the towing company took the car to the police impoundment lot. *Id.* at 40. Trooper Yingst then applied for a search warrant, which was later issued.[1] *Id.* at 41. Inside the vehicle, Trooper Yingst discovered multiple spent shell casings of the same caliber of the previously discovered handgun. *Id.*

Joseph was subsequently arrested and charged with the above referenced firearms charges. After an evidentiary hearing on August 6, 2010, the trial court denied Joseph's motion to suppress the evidence found inside his car. At the conclusion of trial on September 28, 2010, the jury found Joseph guilty of both charges. On November 10, 2010, on the conviction for persons not to possess firearms, the trial court sentenced Joseph to a term of incarceration of from five to ten years in prison. On the conviction for firearms not to be carried without a license, the trial court sentenced Joseph to a concurrent term of incarceration of from not less than three and not more than seven years of imprisonment. The trial court denied all of Joseph's post-sentence motions, and Joseph thereafter filed a timely notice of appeal.

On appeal, Joseph raises six issues for our review and consideration:

1. Did the lower court err in concluding that the *de facto* seizure of [Joseph's] vehicle without a warrant not violate [Joseph's] rights under the Fourth Amendment to the United States Constitution and Article One, Section Eight of the Pennsylvania Constitution.

2. Did the lower court err in concluding that [Joseph] did not abandon the vehicle in a legal sense when the abandonment was forced and a direct result of the improper actions of the police officers involved.

3. Did the lower court err in find that the inventory search was proper, and that even if it were improper, the evidence seized would have inevitably been discovered upon the impoundment of the vehicle.

4. Did the lower court err in finding that a factually defective search war-

---

1. Trooper Yingst's affidavit in support of issuance of the search warrant included a discussion of the discovery of the handgun. N.T., 8/6/10, Commonwealth Exhibit 2.

rant containing multiple errors, including an erroneous description of the vehicle, was nonetheless valid.

5. Was there sufficient evidence presented to find that [Joseph] had the power and intent to control the gun that was found in the back seat of his car.

6. Was [Joseph] unfairly prejudiced by the District Attorney's reference to marijuana allegedly found at the scene which was conspicuously absent from the video and which [Joseph] was never charged with possessing.

Appellant's Brief at 8.

■■■ For his first issue on appeal, Joseph argues that the police officers' seizure of his vehicle while they attempted to obtain a warrant to search it violated his constitutional rights. As such, Joseph contends that the trial court erred in denying his motion to suppress the evidence found in his vehicle. We begin by setting forth our well-established scope and standard of review of an order denying a suppression motion:

Where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. When reviewing a decision from the suppression court, our responsibility is (1) to determine whether the record supports the factual findings of the court below, and (2) to evaluate the legitimacy of the inferences and legal conclusions drawn from those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution which when read in the context of the record as a whole, remains uncontradicted. If the record supports the factual findings below, we are bound by those findings. However, while we are bound by the suppression court's findings of fact if supported by the record, we are not bound by the court's legal conclusions which are drawn from the facts of the case.

*Commonwealth v. Simmons*, 17 A.3d 399, 402 (Pa.Super.2011) (citations omitted), *appeal denied*, —— Pa. ——, 25 A.3d 328 (2011); *Commonwealth v. Russo*, 594 Pa. 119, 126, 934 A.2d 1199, 1203 (2007).

■■■ The trial court ruled that the existence of reasonable suspicion justified Trooper Yingst's seizure of Joseph's vehicle pending the submission of an application for a search warrant. This ruling was in error. Pursuant to Pennsylvania's "limited automobile exception," warrantless vehicle searches and/or seizures must be accompanied by both probable cause and exigent circumstances beyond the mere mobility of the vehicle. *Commonwealth v. Hernandez*, 594 Pa. 319, 328, 935 A.2d 1275, 1280 (2007); *see also Commonwealth v. Luv*, 557 Pa. 570, 581, 735 A.2d 87, 93 (1999); *Commonwealth v. White*, 543 Pa. 45, 51–52, 669 A.2d 896, 900 (1995); *Commonwealth v. Rodriguez*, 526 Pa. 268, 274, 585 A.2d 988, 991 (1991). Where probable cause and exigent circumstances exist, police may either search the vehicle without a warrant or immobilize it until a search warrant may be obtained. *Commonwealth v. Baker*, 518 Pa. 145, 149, 541 A.2d 1381, 1383 (1988), *overruled in part on other grounds, Commonwealth v. Rosario*, 538 Pa. 400, 648 A.2d 1172 (1994). As our Supreme Court made clear in *Commonwealth v. Milyak*, 508 Pa. 2, 493 A.2d 1346 (1985), immobilizing a vehicle while applying for a search warrant is no different, from a constitutional perspective, than conducting a warrantless search. In *Milyak*, our Supreme Court stated that:

So was it observed in *Chambers v. Maroney*, [399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ], that given the constitutional preference for a magistrate's judgment, the alternative to immediate search is to require the immobilization of the vehicle until a search warrant is obtained. Thus, arguably, only this 'lesser' intrusion of seizing the automobile is permissible until a magistrate authorizes the 'greater' intrusion of searching it. However, the question of which was the 'greater' and which the 'lesser' intrusion is itself a debatable question to which the answer might depend on a 'variety of circumstances.' The [United States Supreme Court] was thus unable to conclude whether immediate warrantless search or temporary seizure was the 'lesser' intrusion, and thus held that the Fourth Amendment authorized both:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Milyak*, 508 Pa. at 9–10, 493 A.2d 1346 (quoting *Chambers*, 399 U.S. at 52, 90 S.Ct. 1975).

For these reasons, in *Baker* our Supreme Court observed that "an alternative to an immediate search in the present case would have been to immobilize the vehicle until a warrant could be obtained." *Baker*, 518 Pa. at 149, 541 A.2d at 1383. Because it is not clear that the intrusion arising from immobilization of an automobile is any less imposing than the intrusion of searching it, however, "immobilization has been held to be an alternative, not a requirement." *Id.* (citing *Milyak*, 508 Pa. at 9–11, 493 A.2d 1346).

■ The trial court ruled that Trooper Yingst had a reasonable suspicion of "drug trafficking activity" which justified an "investigative detention" of Joseph's car pending an application for a search warrant. Trial Court Opinion, 2/22/11, at 6–7. This ruling contains two errors. First, as the cases cited above (*Milyak, Chambers,* and *Baker* ) all reflect, the "detention," *i.e.,* the immobilization, of a vehicle pending the filing of an application for a search warrant unquestionably constituted a *seizure* of the vehicle under the Fourth Amendment. Second, as explained above, Pennsylvania's limited automobile exception requires *probable cause* and exigent circumstances for a warrantless seizure, not mere reasonable suspicion.

The trial court cited *Commonwealth v. Chase*, 599 Pa. 80, 960 A.2d 108 (2008), in support of its decision that reasonable suspicion was sufficient in these circumstances. *Id.* at 6. Our Supreme Court's decision in *Chase*, however, cannot be read to justify such a seizure. In *Chase*, the Supreme Court ruled as constitutional 75 Pa.C.S.A. § 6308, as amended, which permits traffic stops based upon reasonable suspicion rather than probable cause.[2] Relying on the principles espoused in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), our Supreme Court in *Chase* ruled that traffic stops based upon "reasonable suspicion that a violation of traffic laws has occurred" pass constitutional muster.

**2.** Investigative detention under the Fourth Amendment and Article I, § 8 are "coterminous." *Commonwealth v. Revere,* 585 Pa. 262, 888 A.2d 694, 699 n.6 (2005). Accordingly, vehicle stops constitutional under *Terry* are also constitutional under Article I, § 8 of the Pennsylvania Constitution. *Chase,* 599 Pa. at 97, 960 A.2d at 117.

In its reliance on *Terry*, however, our Supreme Court emphasized that the nature of the stop in question was "to allow immediate investigation through temporarily maintaining the *status quo.*" *Id.* at 94, 960 A.2d at 115–16. The focus on the *temporal nature* of a *Terry*-type stop is important: "[O]ne must remember the reason why the Constitution tolerates the lesser standard articulated in *Terry* [*i.e.,* reasonable suspicion]—the detention is allowed to maintain the *status quo* so the officer may conduct a *brief* and safe investigation to see if indeed there is criminal activity afoot." *Id.* (emphasis added). Specifically, the Supreme Court described the limited scope of the police officer's investigative authority: "In a *Terry* stop, the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 101–02, 960 A.2d at 120 (quoting *Commonwealth v. Mistler,* 590 Pa. 390, 411, 912 A.2d 1265, 1277 (2006)) (Eakin, J., dissenting) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

▆ The issue in the case *sub judice,* of course, is not the propriety of the initial stop of Joseph's vehicle, as Trooper Yingst clearly had a reasonable suspicion that Joseph had violated traffic laws (including speeding and/or driving under the influence). Instead, the issue here is the constitutionality of Trooper Yingst's seizure of Joseph's vehicle during the course of the traffic stop. To this end, the record on appeal contains no evidence regarding the length of time that would have been required for the troopers to obtain a warrant (including the drafting of an affidavit, its presentation to a magistrate, and then a return to the scene for service). As such, we cannot agree that Trooper Yingst's seizure of Joseph's vehicle while attempting to obtain a warrant constituted a "brief" *Terry*-type investigation. *See, e.g., United States v. Place,* 462 U.S. 696, 708, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("The length of detention of respondent's luggage [90 minutes] alone precludes the conclusion that the seizure was reasonable in the absence of probable cause."). For these reasons, we conclude that seizure of a vehicle for an indeterminate amount of time while the police attempt to obtain a search warrant cannot be constitutionally justified as a *"Terry* stop" based upon mere reasonable suspicion.

In this regard, we also note the incongruity of permitting the police to detain a vehicle while obtaining a warrant to search it based on the officers' *reasonable suspicion* of wrongdoing—since the warrant itself can issue only upon a magistrate's finding of *probable cause* to search.

On appeal, the Commonwealth argues alternatively that, on the facts presented, Trooper Yingst also had probable cause to detain Joseph's vehicle. In addition to the air fresheners, potpourri, soaps, and blunt cigar, the Commonwealth argues Joseph had a criminal history of drug offenses, entered the interstate from an area of high drug trafficking, and became agitated and combative when asked if he had drugs or weapons in the car and for consent to search it. Commonwealth's Brief at 23–26. While these facts clearly provided a reasonable basis for Trooper Yingst's *suspicions* regarding Joseph's activities, we disagree that they established probable cause for a seizure of Joseph's vehicle.

▆ Reasonable suspicion is a less demanding standard than probable cause because, *inter alia,* it can be established with information that is different in quantity or content than that required to establish probable cause. *See, e.g., Commonwealth v. Fell,* 901 A.2d 542, 545 (Pa.Super.2006) (quoting *Alabama v.*

*White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). Reasonable suspicion requires only some founded suspicion that criminal activity may be afoot. *Id.* (citing *Terry* ). Probable cause exists where the facts and circumstances within the knowledge of the officer are based upon reasonably trustworthy information and are sufficient to warrant a man of reasonable caution in the belief that the suspect "has committed or is committing a crime." *Commonwealth v. Thompson,* 604 Pa. 198, 203, 985 A.2d 928, 931 (2009). "In determining whether probable cause exists, we apply a totality of the circumstances test." *Id.*

 In evaluating the totality of the circumstances in this case, we note that Trooper Yingst consistently testified only to his *reasonable suspicions* regarding Joseph. N.T., 8/6/10, at 32 ("I said[ ] based upon my views and the reasonable suspicion I have that you are transporting illegal items within that vehicle ... I am going to ... keep the vehicle here."). The trial court likewise did not conclude that probable cause existed under the facts presented. Trial Court Opinion, 2/22/11, at 7 ("Upon consideration of the totality of the circumstances, the court concludes that this trooper had a sufficient basis to form a reasonable suspicion of drug trafficking activity...").

With regard to the air fresheners, potpourri, and soap in the car, and considering Joseph's criminal history with drugs, these items all fairly contributed to Trooper Yingst's suspicions regarding Joseph's activities on the night of the traffic stop, but none provides any firm basis for concluding that Joseph had drugs in the vehicle *at that time.* These facts are entirely consistent with the possibility that Joseph may have had contraband in the vehicle in the past, or planned to transport contraband in the vehicle on future occasions.

As such, these facts, without more, did not establish probable cause that Joseph had drugs or weapons in his car at the time of the traffic stop. In this regard, we note that Trooper Yingst did not testify that he observed any evidence that Joseph was using drugs when he stopped him, including any odors, smoke, or telltale signs of Joseph's appearance.

 With regard to Trooper Yingst's observation that Joseph became increasing agitated during the traffic stop, the record on appeal reflects that Joseph's level of agitation and aggressiveness did not accelerate until Trooper Yingst informed him that he was seizing the vehicle pending the application for a search warrant. At the suppression hearing, Trooper Yingst testified that after he informed Joseph that he was free to go but that the car would remain at the scene pending a warrant application, that is when Joseph began to get louder, "throwing his arms up, putting his hands in his pockets," and he was "becoming aggressive" and "agitated with the whole situation,"—causing the troopers to un-holster their tasers. N.T., 8/6/10, at 33–34. At trial, Trooper Rudella likewise testified that "[r]ight at the point of asking for the consent to search and the fact that Trooper Yingst was going to apply for a search warrant, that's when the aggression had occurred." N.T., 9/28/10, at 121. Because Joseph's agitation/aggression did not escalate until the time of the seizure itself, it cannot constitute a factor supporting the establishment of probable cause to justify the seizure. We note that Joseph acted within his rights to refuse Trooper Yingst's request for consent to search the vehicle.

 Finally, we will not consider the Commonwealth's suggestion that probable cause existed because Joseph entered the interstate from an area of high drug activity. It is true that a police officer's

**864**

observance of a defendant's conduct *inside* a "high crime area" may, along with other factors, contribute to a finding of probable cause. *Thompson,* 604 Pa. at 212 n. 11, 985 A.2d at 936 n. 11 (2009) (defendant's transaction on street in high crime area at night, coupled with officer's experience involving similar drug-related transactions, provided probable cause for search and seizure); *In the Interest of D.M.,* 566 Pa. 445, 450, 781 A.2d 1161, 1164 (2001) ("[U]nprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment."). In these cases, the police officers observed a defendant's behavior in a "high crime area" that, based upon the police officer's prior experience in observing similar behaviors by others in the past, led them to believe that the defendant was committing or had committed a crime. *See, e.g., Thompson,* 604 Pa. at 211, 985 A.2d at 935 ("In drawing a nexus between his experience and the observations he made, Officer Ortiz testified that he had seen this type of 'exchange done several hundred times' on the street and had made several hundred narcotics arrests of this very type.").

In the present case, in significant contrast, Troopers Yingst and Rudella did not observe any behavior by Joseph in any high crime area. Instead, the evidence of record establishes only that Trooper Yingst may have [3] observed Joseph enter the interstate from an exit adjacent to a "high drug trafficking area." The Commonwealth has not cited to any authority, however, for the proposition that a police officer's mere obtaining of information that a person had entered and then exited from a high crime/drug area may constitute a basis for establishing probable cause that

the person is transporting drugs, and we are not aware of any such authority. To the contrary, in our view, this proposition is entirely too broad, since every person entering the interstate from an exit in proximity to a high crime area could then be fairly suspected of serious wrongdoing.

For these reasons, we conclude that the trial court erred in denying Joseph's motion to suppress evidence obtained from his vehicle after its seizure without probable cause. We vacate the judgment of sentence and remand to the trial court for further proceedings consistent with this decision. Jurisdiction relinquished.

---

**3.** As indicated hereinabove, *supra* pages 2–3, Trooper Yingst could not identify which exit Joseph actually used to access the interstate, testifying both at the suppression hearing and at trial that he could not remember whether Joseph used either the 13th Street or the 19th Street exit. N.T., 8/6/10, at 23; N.T., 9/27/10, at 30.