**[J-64-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 38 EAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court entered on 03/26/2018 at No. |
| | : | 730 EDA 2017 (reargument denied |
| v. | : | 05/23/2018), reversing and remanding |
| | : | the Order entered on 02/08/2017 in |
| | : | the Court of Common Pleas, |
| TIMOTHY TRAHEY, | : | Philadelphia County, Criminal |
| | : | Division, at No. CP-51-CR-0000422- |
| Appellant | : | 2016. |
| | : | |
| | : | ARGUED: September 10, 2019 |


**OPINION**


**JUSTICE WECHT**                                       **DECIDED: April 22, 2020**

In this discretionary appeal, we revisit the limitations that the Fourth Amendment to the United States Constitution places upon the collection of evidence from the body of a motorist suspected of driving under the influence of alcohol or controlled substances ("DUI"), in light of the Supreme Court of the United States' decisions in *Missouri v. McNeely*, 569 U.S. 141 (2013), *Birchfield v. North Dakota*, __ U.S. __, 136 S.Ct. 2160 (2016), and *Mitchell v. Wisconsin*, __ U.S. __, 139 S.Ct. 2525 (2019) (plurality). This matter concerns the exigent circumstances doctrine.[1]

---

[1]    In Fourth Amendment jurisprudence, the exigent circumstances doctrine refers to an exception to the warrant requirement applicable where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely*, 569 U.S. at 148-49 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).

The trial court granted Timothy Trahey's motion to suppress the results of a blood test that revealed his blood alcohol concentration ("BAC"), finding no justification for the investigating officers' failure to obtain a search warrant before conducting the test. On the Commonwealth's appeal, the Superior Court reversed, opining that the Commonwealth's evidence sufficiently established the existence of exigent circumstances, thus excusing the absence of a warrant. We reverse the order of the Superior Court.

**I.**

The facts giving rise to this appeal, as summarized from the suppression court's findings, are as follows. On the evening of September 4, 2015, the Friday before Labor Day, 911 dispatchers received a report that a motorist had stricken a bicyclist with a pickup truck on the 4900 block of Wynnewood Avenue in Philadelphia. The accident was reported at 9:15 p.m., but, because the Philadelphia Police Department assigns a relatively low priority to vehicular accident response, police officers were not dispatched to the scene until 10:01 p.m. Officers Christopher Marchesani and Derrick Lewis arrived at the scene at approximately 10:04 p.m. The bicyclist already had been transported to a hospital, but ultimately died from the injuries sustained. A group of bystanders informed the officers that Trahey was operating the pickup truck when he collided with the bicyclist. Officer Marchesani approached Trahey, who confirmed that he was the driver. During his interaction with Trahey, Officer Marchesani noticed that Trahey smelled of alcohol, that his speech was slow and slurred, that his eyes were glassy, and that his gait was unsteady. Based upon these observations, Officer Marchesani arrested Trahey for DUI.

The officers had spent approximately thirty minutes at the accident scene before they departed to transport Trahey to the Police Detention Unit ("PDU"). While *en route* to the PDU, they were called back to the scene by officers of the Accident Investigation

District ("AID"), a unit that specializes in the investigation of accidents involving critical injuries. After observing the indicia of Trahey's intoxication, and learning that over an hour had passed since the accident, AID Officer Patrick Farrell became concerned with the timing of a BAC test.[2] Accordingly, at 10:49 p.m., Officer Farrell sent Trahey to the PDU for a blood test.

AID Officer John Zirilli was the officer assigned to conduct breath and blood tests that evening. In accordance with a Department policy for the investigation of accidents involving serious injuries, Officer Zirilli selected a blood test rather than a breath test. No officer attempted to obtain a search warrant for the blood draw. Upon encountering Trahey, Officer Zirilli advised him of the requirements of Pennsylvania's "implied consent" law,[3] which, at the time, included warnings that the refusal to submit to chemical testing could result in legal consequences, including increased criminal penalties upon conviction. Trahey verbally acknowledged these warnings, stated that he would submit to a blood test, and signed the applicable form. However, Trahey did not check the box on the form indicating that he agreed to undergo blood testing. A nurse drew Trahey's blood at 11:20 p.m.

Trahey was charged with DUI, homicide by vehicle while driving under the influence, homicide by vehicle, and involuntary manslaughter. During the pre-trial proceedings, however, the Supreme Court of the United States issued its decision in *Birchfield*. Drawing a constitutional distinction between breath and blood, the *Birchfield*

---

[2]     The DUI statute provides, in relevant part, that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath" falls within specified ranges "*within two hours* after the individual has driven, operated or been in actual physical control of the movement of the vehicle." 75 Pa.C.S. § 3802(a)(2), (b), (c) (emphasis added).

[3]     *See generally* 75 Pa.C.S. § 1547.

Court held that a breath test may be conducted without a search warrant as a valid search incident to arrest. *Birchfield*, 136 S.Ct. at 2185. The same cannot be said of the "significantly more intrusive" blood test, the reasonableness of which "must be judged in light of the availability of the less invasive alternative of a breath test." *Id.* at 2184. Following the *Birchfield* decision, on November 30, 2016, Trahey filed a motion to suppress the results of his blood test, asserting that the test was unconstitutional without a search warrant.

On February 8, 2017, the trial court held a hearing on Trahey's motion. Officer Zirilli testified regarding his interactions with Trahey, the procedure that he followed before having Trahey's blood drawn, and his recitation of the "implied consent" warnings. Notes of Testimony, Suppression Hearing, 2/8/2017 ("N.T."), at 6-22. Officer Zirilli confirmed that a blood test ordinarily is selected when a vehicular accident results in death or serious injury, and that he chose a blood test for that reason. *Id.* at 7, 38. However, Officer Zirilli acknowledged that an Intoxilyzer 8000 breath-testing machine was present in the room when he was interacting with Trahey. *Id.* at 23.

Officer Marchesani testified about his initial response to the accident scene and his investigation thereof. He established the beginning of the relevant time frame, confirming that the initial report of the collision was received at 9:15 p.m., and that he and his partner were dispatched to the scene at 10:01 p.m. *Id.* at 85-87. Officer Marchesani explained this temporal gap by describing the hierarchy pursuant to which police response is prioritized in Philadelphia. The highest priority is assigned to incidents requiring officer backup, then to reports involving weapons or robberies, then to burglaries or vandalism in progress, then to domestic violence reports, and finally to vehicular accident response. *Id.* at 46, 68-69.

AID Officer Farrell testified, accounting for the time that elapsed after AID officers took responsibility for the investigation. Officer Farrell detailed his concern for the timing of a BAC test upon learning that the accident had occurred approximately one hour before AID's arrival at the scene. *Id.* at 97-98. Officer Farrell confirmed that AID officers transported Trahey to the PDU at 10:49 p.m. *Id.* at 99-100.

Finally, AID Officer Daniel Shead testified. Officer Shead detailed the responsibilities of various AID officers when they are on duty, as well as certain procedures involved in DUI investigation. He testified that, on the evening in question, two AID officers were on duty at AID headquarters and three officers were in the field, including himself. *Id.* at 108. Because one officer was assigned to answer the telephone and one officer was assigned to conduct chemical tests, Officer Shead opined that no one at the headquarters was available to begin preparing a search warrant before Trahey arrived. *Id.* at 109-11. He noted, however, that, had Trahey refused to submit to a blood draw, the officers "would have tried to secure a search warrant" for the test. *Id.* at 111.

With regard to the process for obtaining a search warrant and the time frame involved, Officer Shead detailed the steps that an officer would have to take in order to obtain a warrant. First, an officer must leave the accident scene and return to AID headquarters, which in this case would have taken between ten and fifteen minutes. *Id.* at 113, 118. The officer then must write an affidavit, which may take twenty to thirty minutes. *Id.* at 113, 118. The officer must submit the affidavit to an Assistant District Attorney for review, which takes another ten to fifteen minutes. *Id.* at 113, 119. If approved, the officer must prepare the search warrant application on a typewriter. *Id.* at 113. With the documents completed, the officer must contact the arraignment court and determine whether a bail commissioner is available to approve the warrant. *Id.* at 113-114. Officer Shead opined a commissioner might be available right away, or the affiant

might have to wait upwards of an hour, there being "no rhyme or reason" for the time variation. *Id.* at 113, 114, 120. Once a commissioner is available, the officer must travel from AID headquarters, which may take another ten minutes. *Id.* at 121. Waiting for a commissioner could then take between five and thirty minutes. *Id.* The bail commissioner's review takes another five minutes. *Id.* at 122. All told, Officer Shead opined, the procedure for obtaining a search warrant at the time would take, at best, seventy to seventy-five minutes, but could take up to three hours. *Id.* at 122-23.

The court asked Officer Shead if he was aware that, due to the intervening change in the law, blood testing requires a search warrant absent exigent circumstances. Officer Shead stated his understanding that a search warrant is required if the suspect refuses to submit to chemical testing. *Id.* at 126-27. He opined that, had Trahey refused the blood draw, "then there would have been a warrant gotten that night because of the injuries that were sustained and whatever else happened at the accident." *Id.* at 127. The court asked whether the officers would have requested a breath test in that situation, and Officer Shead replied: "No. We would have gotten a search warrant for the blood." *Id.* at 128. Asked why the officers would choose a blood test over a breath test, Officer Shead explained that "a Breathalyzer only shows someone's blood alcohol concentration" but does not reveal whether there are any "other intoxicants" such as controlled substances in the suspect's system. *Id.* at 128. "A blood test shows everything." *Id.* at 129.

At the conclusion of the suppression hearing, the court placed its conclusions of law on the record, first opining that Trahey's purported consent to the blood draw was invalid because he was warned that failure to comply could result in enhanced criminal penalties—a consequence held unconstitutional in *Birchfield. Id.* at 178-79. The court further rejected the Commonwealth's assertion of exigent circumstances, noting that the

officers did not give any consideration to applying for a search warrant because they believed that Trahey validly consented to the blood draw. The court rejected the claim of exigency, deeming it a *post hoc* rationale that did not motivate the officers at the time. *Id.* at 180-81. The court further observed that all of the officers who encountered Trahey noted that he smelled like alcohol, and that "[t]his is a case where a Breathalyzer could have been taken." *Id.* at 181. Accordingly, finding no justification for a warrantless blood draw, the court granted Trahey's motion to suppress the results of the blood test.

The Commonwealth filed an interlocutory appeal pursuant to Pa.R.A.P. 311(d),[4] and the Superior Court reversed. *Commonwealth v. Trahey*, 183 A.3d 444 (Pa. Super. 2018). The intermediate court first concluded that the suppression court erred by assessing the Commonwealth's claim of exigency by reference to the officers' actual beliefs and motivations, because the prevailing standard requires a court to "determine whether the warrantless search was *objectively reasonable* under the Fourth Amendment." *Id.* at 451 (emphasis in original). Quoting this Court's decision in *Commonwealth v. Martin*, 101 A.3d 706 (Pa. 2014), which, in turn, quoted the Supreme Court's decision in *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011), the Superior Court observed that evaluating "reasonableness" under the Fourth Amendment requires a court to "ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable whatever the subjective intent motivating the relevant officials." *Trahey*, 183 A.3d at 451 (quoting *Martin*, 101 A.3d at 721-22). Had the suppression court correctly viewed the facts under an objective standard, the Superior Court opined, "it would have found ample evidence to deny suppression of the blood evidence." *Id.* at 452.

---

[4]  *See* Pa.R.A.P. 311(d) (authorizing an interlocutory appeal as of right from a suppression order "where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

Specifically, the Superior Court pointed to the officers' testimonies regarding the desirability of testing a suspect's BAC within two hours after the time of the accident and the fact that the officers did not arrive at the scene until nearly fifty minutes after the first emergency report. The court emphasized that the officers were not aware that the incident was DUI-related until their arrival and that there was additional delay resulting from the transfer of the investigation to the specialized AID officers. It further highlighted the "lack of manpower" available that evening, inasmuch as only five AID officers were on duty and they were responsible for all critical and DUI-related accident investigations in Philadelphia. *Id.* at 452. The court particularly highlighted Officer Shead's testimony regarding the "practical problems" accompanying the process of obtaining a search warrant, and noted that the defense "did not contest the prosecution's evidence that it would have taken officers anywhere from seventy minutes to three hours to successfully obtain a warrant." *Id.* Based upon these facts, the Superior Court deemed it "reasonable to believe that the arresting officers were confronted with exigent circumstances, in which the delay necessary to obtain a warrant threatened the destruction of evidence." *Id.* Accordingly, the court reversed the suppression order.[5]

We granted Trahey's petition for allowance of appeal in order to review the Superior Court's determination that the warrantless blood draw conducted in this case was justified by exigent circumstances.[6]

---

[5] President Judge Emeritus John T. Bender concurred in the result of the Superior Court's decision, but did not join the majority's opinion.

[6] Specifically, as rephrased in our order granting allowance of appeal, the question before this Court is: "Do the facts and circumstances in this case justify a warrantless blood draw under the exigent circumstances exception to the warrant requirement?" *Commonwealth v. Trahey*, 196 A.3d 603 (Pa. 2018) (*per curiam*).

## II.

Trahey argues that the Commonwealth's evidence regarding the difficulty of obtaining a search warrant was "speculative" because, no attempt to obtain a warrant having been made, it is unknown how long the process would have taken in this case. Brief for Trahey at 17. The Commonwealth's central argument before the suppression court, Trahey contends, was that applying for a search warrant is time-consuming and that the alcohol in a suspect's blood is metabolizing during that time, which is an argument that could apply to all DUI cases. *Id.* at 22-23. More fundamentally, given the ready availability of a breath test, the lawfulness of conducting such a test without a search warrant under *Birchfield*, and the absence of any suggestion that Trahey was impaired by any substance other than alcohol, Trahey argues that a blood test was wholly unnecessary. He posits that "[t]here cannot be exigent circumstances to obtain something that is not even needed in the first place." *Id.* at 18 (emphasis omitted). Even if, *arguendo*, the officers had reason to suspect the presence of controlled substances in his system, Trahey contends that "illicit drugs take much longer than alcohol to metabolize," and therefore a delay necessitated by a search warrant application would not risk the destruction of such evidence. *Id.* at 22.

Trahey further criticizes the practices of the Philadelphia Police Department. Taking aim at the officers' delayed response time, as well as the asserted time constraints involved in the search warrant application process, Trahey questions the low priority assigned to vehicular accidents involving critical injuries and the decision to place only five AID officers on duty for all of Philadelphia that evening, the beginning of Labor Day weekend. *Id.* at 27. "If the Philadelphia Police Department is going to unnecessarily insist on using the far more intrusive blood test as opposed to a less intrusive and [c]onstitutionally permissible breath test," Trahey argues, "then the department needs to

set up an infrastructure that can timely process the required search warrant request." *Id.* Along these lines, Trahey highlights that the High Court in *Birchfield* considered two cases arising in North Dakota, which, the Court noted, has only fifty-one state district judges and thirty-one magistrates, with no magistrates in twenty of the state's fifty-three counties. *Id.* at 24 (quoting *Birchfield*, 136 S.Ct. at 2181). Given that the *Birchfield* Court demanded compliance with the warrant requirement for blood tests in North Dakota, where "relatively few state officials have authority to issue search warrants," *Birchfield*, 136 S.Ct. at 2181, Trahey contends that there is no justification for applying a lower standard to the City of Philadelphia, "which has the type of substantial law enforcement and legal infrastructure that is required for a major city." Brief for Trahey at 23.

Relatedly, to the extent that the delay in response time and the AID staffing limitations gave rise to an urgent need for a warrantless blood draw, Trahey argues that those circumstances were within the control of the police and, thus, that any exigency was one of the officers' own making. Because police officers cannot rely upon exigent circumstances "where the exigency derives from their own actions," *id.* at 27 (quoting *Commonwealth v. Demshock*, 854 A.2d 553, 557 (Pa. Super. 2004)), Trahey urges this Court to reject the Superior Court's analysis.

The Commonwealth, by contrast, disputes that the delays in this case were within the officers' control. Citing Officer Marchesani's testimony regarding the hierarchy of incidents requiring police response, the Commonwealth asserts that police dispatchers must adhere to that system, that the officers did not choose when they would be dispatched to the accident scene, and that this "was not a situation where police were purposefully biding their time." Brief for Commonwealth at 19-20. The Commonwealth appears to dispute the Superior Court's characterization of the relative "lack of manpower" available that evening, and refers to testimony suggesting that there was a "higher-than-

normal number of officers on duty." *Id.* at 16 (citing N.T. at 133). Notwithstanding the above-average number of available officers, the Commonwealth maintains that there was no opportunity to apply for a search warrant. The Commonwealth emphasizes that the responding officers, through no fault of their own, were not dispatched to the accident scene until forty-six minutes after the first report of the collision, that they were unaware at that time that Trahey may have been intoxicated, and that approximately ninety-six minutes had elapsed by the time that they were able investigate, arrest, and transport Trahey to the PDU. *Id.* at 13-14. Even with their best efforts, the Commonwealth highlights, the officers here were unable to have Trahey's blood drawn until 125 minutes after the collision. *Id.* at 14. Any further delay, the Commonwealth argues, "would have threatened, if not guaranteed, the destruction of evidence" of Trahey's BAC. *Id.*

With regard to the time-sensitivity of the investigation, the Commonwealth stresses that the "optimal period" to obtain BAC evidence from a DUI suspect is within two hours after the suspect's last operation of the vehicle. *Id.* at 14 (citing 75 Pa.C.S. § 3802(a)-(c)). Given the constant dissipation of the alcohol in Trahey's bloodstream, the Commonwealth contends that "it would have been impossible to secure a warrant within a reasonable timeframe to preserve reliable evidence." *Id.* at 15. In this regard, the Commonwealth emphasizes Officer Shead's testimony that it would have taken at least seventy minutes to obtain a search warrant, but that it could have taken as long as three hours. *Id.* at 15-16. Because the officers did not develop probable cause to suspect Trahey of DUI until nearly eighty minutes after the accident, the Commonwealth argues that there was no conceivable way for the officers to obtain a search warrant with enough time to obtain a satisfactory reading of Trahey's BAC, *i.e.*, "before hitting the two-hour window to preserve reliable evidence." *Id.* at 18.

The Commonwealth disputes Trahey's assertion that a breath test would have served law enforcement needs adequately, or that it must have made some separate showing of the necessity for a warrantless blood test. Although it concedes that the available evidence suggested that Trahey was under the influence of *alcohol*, the Commonwealth contends that the "police had a responsibility to obtain all relevant evidence of his intoxication, which may have included the use of other substances that caused side effects not as immediately apparent as alcohol." *Id.* The Commonwealth emphasizes the *McNeely* Court's holding that the Fourth Amendment requires officers to obtain a search warrant for a blood draw provided that they can do so "without significantly undermining the efficacy of the search." *Id.* (quoting *McNeely*, 569 U.S. at 152). Where exigent circumstances create a delay that undermines the efficacy of the search, the Commonwealth observes, "a warrantless search is reasonable." *Id.* It asserts, however, that "[t]here is no suggestion in *McNeely*, or any case cited by [Trahey], that police must also prove that they could not have performed a less accurate breathalyzer test" or that the Commonwealth must make "some showing of probable cause to suspect that a search will reveal the presence of an intoxicant other than alcohol." *Id.* at 18-19.

"The greatest exigency in this case," the Commonwealth argues, "was that each passing minute threatened the destruction of evidence" in Trahey's bloodstream. *Id.* at 20. The threat of that diminishing evidentiary value was, in the Commonwealth's words, "exacerbated by constraints that delayed police from responding to the scene of the accident," but which lay outside the control of the officers. *Id.* Thus, the Commonwealth concludes, the warrantless blood draw conducted in this case was justified by exigent circumstances, and that exigency was not one of the officers' own making.

**III.**

Because Trahey prevailed before the suppression court, our scope of review permits us to "consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted" in the record. *Commonwealth v. Lukach*, 195 A.3d 176, 183 (Pa. 2018) (quoting *Commonwealth v. Mistler*, 912 A.2d 1265, 1268-69 (Pa 2006)). Trahey did not offer any evidence at the suppression hearing, however, and relied solely upon legal propositions relating to the constitutionality of the warrantless blood draw. Accordingly, we may consider all of the Commonwealth's evidence in determining whether the suppression court's findings of fact are supported by the record, in which case they are binding upon this Court. *Id.* By contrast, we review the court's legal conclusions *de novo*. *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010).

As a preliminary matter, we note that, although the legal question before us is significantly informed by the *Birchfield* decision, the events at issue here preceded the issuance of the Court's opinion in that case.[7] Accordingly, we recognize that the officers in this matter had no reason to anticipate the subsequent change in the law. Moreover, in the context of criminal sentencing for DUI offenses, where *Birchfield* also has significantly altered the governing legal framework, we have held that the decision does not apply retroactively to collateral attacks on the legality of sentences that became final before *Birchfield* was decided. *Commonwealth v. Olson*, 218 A.3d 863 (Pa. 2019). Nonetheless, litigants generally are entitled to benefit from changes in the law that develop before their judgments of sentence become final, provided that "the issue in question is properly preserved at all stages of adjudication up to and including any direct appeal." *Commonwealth v. Cabeza*, 469 A.2d 146, 148 (Pa. 1983); *accord*

---

[7]     Trahey was arrested and subjected to a warrantless blood draw on September 4, 2015. The Supreme Court of the United States decided *Birchfield* on June 23, 2016.

*Commonwealth v. Hays*, 218 A.3d 1260 (Pa. 2019).  Trahey indisputably preserved his challenge to the legality of the blood draw by filing, litigating, and prevailing on his suppression motion prior to trial.  Accordingly, although the investigating officers were reasonably operating under an older understanding of the requirements of the Fourth Amendment, Trahey is entitled to a review conducted through the lens of the Supreme Court's more recent pronouncements in this area.

**A.**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend IV.

Both breath tests and blood tests constitute "searches" within the meaning of the Fourth Amendment.  *See Skinner v. Ry. Labor Executives' Assn.*, 489 U.S. 602, 616-17 (1989); *Schmerber v. California*, 384 U.S. 757, 767-68 (1966).  Accordingly, conducting such a search without a warrant "is reasonable only if it falls within a recognized exception" to the warrant requirement.  *McNeely*, 569 U.S. at 148 (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)).  One such exception, as noted above, applies where "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment."  *Id.* at 148-49 (quoting *King*, 563 U.S. at 460).  Although an exigency may present itself in a variety of contexts, its defining trait is a "compelling need for official action and no time to secure a warrant."  *Id.* at 149 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)).  Such a need may arise, for instance, "to prevent the imminent destruction of evidence."  *Id.* (citing *Cupp v. Murphy*, 412 U.S. 291, 296 (1973); *Ker v. California*, 374 U.S. 23, 40-41

(1963)). In evaluating the presence of an exigency, we consider the totality of the circumstances. *Id.* (citing *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006)).

In this case, the Superior Court's legal conclusion—that the warrantless blood draw was justified by exigent circumstances—rested upon the synthesis of two propositions. The first premise is that the anticipation of difficulty in obtaining and executing a search warrant prior to the expiration of the two-hour window set forth in the DUI statute, *see, e.g.*, 75 Pa.C.S. § 3802(a)(2), the "optimal time period to obtain accurate blood testing evidence," *Trahey*, 183 A.3d at 452, gives rise to an urgent need for warrantless testing. The second premise is that breath testing and blood testing are materially equivalent with regard to that antecedent justification, *i.e.*, that once the urgent need for BAC testing is established, either type of test may be conducted without a search warrant. A review of *McNeely*, *Birchfield*, and, most recently, *Mitchell*, reveals error in this approach.

**B.**

In *McNeely*, the Court rejected the government's argument that the natural dissipation of alcohol in a DUI suspect's bloodstream constitutes a "*per se* exigency" that categorically justifies warrantless BAC testing. *McNeely*, 569 U.S. at 147. The Court relied upon its 1966 decision in *Schmerber*, where it held that an officer who arrested a DUI suspect at a hospital following an automobile accident lawfully could demand the suspect's submission to a warrantless blood test because, due to the body's natural metabolic processes, the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Schmerber*, 384 U.S. at 770 (internal quotation marks omitted). The *McNeely* Court clarified that *Schmerber* does not stand for a *per se* rule in that regard, but in fact turned upon the individual facts and

circumstances of the case, including the need to investigate the accident scene and to allow the suspect to be transported to a hospital for medical treatment, which left "no time to seek out a magistrate and secure a warrant." *McNeely*, 569 U.S. at 151 (quoting *Schmerber*, 384 U.S. at 771).

Schmerber having failed to resolve the question of a *per se* rule, the *McNeely* Court addressed whether the state's proposed approach otherwise could be justified under the exigent circumstances doctrine. The Court deemed such a rule inconsistent with the "careful case-by-case assessment of exigency" required by the totality of the circumstances test, *id.* at 152, and reasoned that adopting a *per se* rule would countenance a "considerable overgeneralization" of the governing standard. *Id.* at 153 (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393 (1997)). The proposed *per se* rule further failed to "account for advances in the 47 years since *Schmerber* was decided that allow for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple." *Id.* at 154. Adopting the state's *per se* rule, "would improperly ignore the current and future technological developments in warrant procedures, and might well diminish the incentive for jurisdictions 'to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement.'" *Id.* at 156 (quoting *State v. Rodriguez*, 156 P.3d 771, 779 (Ut. 2007)).

The Court acknowledged that, technological developments notwithstanding, search warrant applications inevitably entail some amount of delay, and that certain factual scenarios may support findings of exigent circumstances arising from "delays from the warrant application process." *Id.* at 156. The Court hypothesized, for example, that "practical problems" such as issues arising from "the procedures in place for obtaining a

warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search." *Id.* at 164. However, such a determination, the Court held, requires a case-specific assessment of the circumstances.

"In short," the *McNeely* Court held, "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically." *Id.* Rather, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id.* Stated differently, "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at 152.[8]

*McNeely* having rejected the theory that the exigent circumstances doctrine provides a blanket justification for warrantless BAC testing, a question remained as to whether such testing could be justified categorically upon the basis of a different exception to the warrant requirement. In *Birchfield*, the Court provided an answer. A consolidation of three separate cases involving both breath and blood tests, the *Birchfield* decision focused upon the categorical authority provided by the search-incident-to-arrest doctrine.[9] In a significant development of Fourth Amendment jurisprudence, the *Birchfield*

---

[8]    Portions of *McNeely*, principally those engaging the arguments of the responsive opinions, did not garner majority support, rendering *McNeely* a plurality decision in part. The foregoing quotations are taken only from the sections of the Court's opinion that received majority support, and that thus bind this Court.

[9]    The question before the *Birchfield* Court was whether a DUI arrestee could be "convicted of a crime or otherwise penalized" for refusing to comply with warrantless breath or blood testing. *Birchfield*, 136 S.Ct. at 2172. However, the Court treated this question as a Fourth Amendment matter. The criminal law may not compel an individual to submit to an unconstitutional search, but "[i]f, on the other hand, such warrantless searches comport with the Fourth Amendment, it follows that a State may criminalize the refusal to comply with a demand to submit to the required testing, just as a State may

Court introduced a new distinction in the law between breath and blood tests, based upon a comparative assessment of "the degree to which they intrude upon an individual's privacy and the degree to which they are needed for the promotion of legitimate governmental interests." *Birchfield*, 136 S.Ct. at 2176 (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)) (cleaned up).

A breath test, the Court reasoned, does not implicate "significant privacy concerns." *Id.* (quoting *Skinner*, 489 U.S. at 626). It requires no piercing of one's skin, entails minimal inconvenience or embarrassment, preserves no personal information aside from BAC, and collects nothing that humans do not dispel naturally by ordinary breathing. *Id.* at 2176-77. "Blood tests," the Court reasoned, "are a different matter." *Id.* at 2178. Such tests involve piercing the skin and extracting material from a person's body that is not naturally dispelled. *Id.* Blood tests further allow for the collection and preservation of a much broader array of information than a simple BAC reading. *Id.* Accordingly, the *Birchfield* Court concluded that blood testing has a much greater impact upon privacy interests than breath testing.

Turning to the governmental interests implicated, the Court readily acknowledged that both the state and federal governments have a "paramount interest" in preserving the safety of public highways, and that BAC testing of impaired drivers serves that interest. *Id.* (quoting *Mackey v. Montrym*, 443 U.S. 1, 17 (1979)). Rejecting the position of the dissenting Justices, who would except neither breath nor blood testing from the warrant requirement, the Court opined that, if every DUI arrest in the nation necessitated a search warrant application, "the courts would be swamped." *Id.* at 2180. The Court pointed to

---

make it a crime for a person to obstruct the execution of a valid search warrant." *Id.* Thus, the question of the legality of the criminal penalty was answered "by considering whether the searches demanded in these cases were consistent with the Fourth Amendment." *Id.* at 2173.

North Dakota, from which two of the three cases before it originated, highlighted the relatively low number of judicial officers empowered to issue search warrants in that state, and concluded that demanding a warrant for every BAC test there would not be a "light burden." *Id.* at 2181. Because the government's interest in obtaining the evidence is substantial, and because the search-incident-to-arrest doctrine encompasses a recognition of the necessity of preventing the loss or "destruction" of evidence, *id.* at 2182 (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)), the Court held that "the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving." *Id.* at 2184. "The impact of breath tests on privacy is slight, and the need for BAC testing is great." *Id.* "Blood tests," by contrast, "are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test." *Id.* The Court added that the government had "offered no satisfactory justification for demanding the more intrusive alternative without a warrant." *Id.*

The Court noted that breath tests have been in common use for many years, that their results are admissible in court and widely credited by juries, and that no party disputed their "accuracy or utility." *Id.* at 2184. "What, then," the Court asked, "is the justification for warrantless blood tests?" *Id.* The Court considered and rejected a number of proposed justifications for warrantless blood testing, beginning with an observation that anticipated the arguments offered in the instant case. A blood test, the Court noted, can detect not only alcohol, "but also other substances that can impair a driver's ability to operate a car safely." *Id.* "A breath test cannot do this," the Court acknowledged, "but police have other measures at their disposal when they have reason to believe that a motorist may be under the influence of some other substance (for example, if a breath test indicates that a clearly impaired motorist has little if any alcohol in his blood)." *Id.* Further, a blood test may be administered to uncooperative or unconscious individuals

who cannot or will not comply with breath testing procedures, or who deliberately attempt to blow an insufficient breath sample. *Id.* at 2184-85. Despite these additional benefits that blood testing may offer under certain circumstances, the Court remained unpersuaded that these considerations justified a categorical exception to the warrant requirement. In such situations, a case-specific exigency may be established, or "a warrant for a blood test may be sought." *Id.* at 2185.

Summarizing its reasoning, the Court held that, "[b]ecause breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, . . . a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving." *Id.* Accordingly, breath tests, but not blood tests, are categorically excepted from the Fourth Amendment's warrant requirement. *Id.*[10]

The Supreme Court revisited this subject most recently in *Mitchell*. A plurality decision, *Mitchell* addressed a "narrow but important category of cases: those in which the driver is unconscious and therefore cannot be given a breath test." *Mitchell*, 139 S.Ct. at 2531 (plurality). Building upon *McNeely* and *Birchfield*, the *Mitchell* plurality again highlighted the compelling governmental interest in obtaining BAC evidence from impaired drivers. *Id.* at 2535-37. Although, under *Birchfield*, a breath test generally satisfies that interest, the *Mitchell* plurality observed that, "in the case of unconscious drivers, who cannot blow into a breathalyzer, blood tests are essential for achieving the compelling interests" of law enforcement. *Id.* at 2537. The question that the plurality

---

[10] The *Birchfield* Court further rejected the government's alternative argument that the blood tests at issue could be justified upon the basis of a statutory "implied consent" provision, holding that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Birchfield*, 136 S.Ct. at 2186. This theory is not at issue in the instant case.

framed was "whether this compelling need justifies a warrantless search" under the exigent circumstances doctrine. *Id.*

Under that doctrine, the plurality reasoned, a warrantless blood draw may be permissible when, in conjunction with the dissipation of BAC evidence, "some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Id.* The unconscious state of a motorist not only suggests a dangerous degree of intoxication, but "is *itself* a medical emergency." *Id.* (emphasis in original). Further, many unconscious-driver cases will involve vehicular accidents, which "might give officers a slew of urgent tasks" such as ensuring prompt medical attention for other injured persons, providing first aid until medical personnel arrive, preserving evidence, or blocking or redirecting traffic around the accident scene. *Id.* at 2538. Where these "rival priorities" are present, officers may be required to delay a warrant application and thus the BAC test, "to the detriment of its evidentiary value and all the compelling interests served by BAC limits." *Id.* Accordingly, where police officers have probable cause to believe that a suspect has committed a DUI offense, but the suspect's unconscious state "requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test," the officers "may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment." *Id.* at 2539.[11]

---

[11] Justice Thomas concurred only in the judgment of *Mitchell*, reiterating his dissenting position in *McNeely* that warrantless BAC testing always should be permitted under a *per se* exigency theory, "regardless of whether the driver is conscious." *Mitchell*, 139 S.Ct. at 2539 (Thomas, J., concurring in the judgment). Because no single rationale in *Mitchell* commanded a majority on any point, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 764 n.9 (1988) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)) (bracket omitted). Justice Thomas having advanced a broader rationale, the narrowest grounds supporting the judgment were those offered by the plurality. Accordingly, the holding of *Mitchell*, in the

In light of these recent pronouncements, it is clear that the Supreme Court of the United States has signaled its preference for breath testing in order to avoid the undesirable consequence of BAC evidence dissipating as a result of the delays attending the search warrant application process. The *Birchfield* Court's constitutional distinction between breath and blood testing is unmistakable, and the *Mitchell* plurality premised its legal conclusion upon the existence of a circumstance in which "a breath test is impossible." *Mitchell*, 139 S.Ct. at 2531 (plurality). Indeed, the *Mitchell* plurality repeated this limitation of its holding no fewer than ten times throughout its opinion.[12]

**C.**

Returning to the instant case, as noted above, the Superior Court premised its finding of exigency upon the justifiable delay in police response to the accident scene, the number of AID officers on duty that evening, and Officer Shead's testimony detailing the time frames involved in the search warrant application process in Philadelphia at the

---

plurality's words, is that where a "driver is unconscious and therefore cannot be given a breath test," the "exigent-circumstances rule almost always permits a blood test without a warrant." *Mitchell*, 139 S.Ct. at 2531. *See also People v. Eubanks*, __ N.E.3d __, 2019 WL 6596704 at *13 n.6 (Ill. 2019) (concluding that the *Mitchell* plurality's rationale represents the Court's holding).

[12] *See Mitchell*, 139 S.Ct. at 2531 (plurality) ("the driver is unconscious and therefore cannot be given a breath test"); *id.* ("When a breath test is impossible . . ."); *id.* at 2533 ("unconsciousness also deprived officials of a reasonable opportunity to administer a breath test"); *id.* at 2534 ("no reasonable opportunity to give Mitchell a breath test using 'evidence-grade breath testing machinery'"); *id.* ("when a driver's unconsciousness (or stupor) eliminates any reasonable opportunity for [an evidence-grade] breath test"); *id.* at 2535 ("And when a breath test is unavailable to advance those aims, a blood test becomes essential."); *id.* at 2536 ("[W]hen a breath test is unavailable to promote those interests, 'a blood draw becomes necessary.'"); *id.* at 2537 ("Thus, in the case of unconscious drivers, who cannot blow into a breathalyzer, blood tests are essential for achieving the compelling interests described above."); *id.* ("[T]here clearly is a 'compelling need' for a blood test of drunk-driving suspects whose condition deprives officials of a reasonable opportunity to conduct a breath test."); *id.* at 2539 ("the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test").

time—seventy minutes on the low end, and upwards of three hours on the high end. *Trahey*, 183 A.3d at 452. After discussing *Schmerber* and *McNeely*, but not *Birchfield*'s distinction between breath and blood, the Superior Court concluded that the expected difficulty that the officers would have faced in obtaining a search warrant within two hours after the accident, the "optimal time period to obtain accurate blood testing evidence," *id.*, gave rise to a case-specific exigency justifying a warrantless blood draw.

The Superior Court's analysis is problematic. First, as Trahey repeatedly emphasizes, the intermediate court paid no heed to the availability of a breath test in this case. Brief for Trahey at 28 ("Trahey was sitting right next to the machine and no warrant would be needed."). Second, if an expected inability to obtain a search warrant within two hours is sufficient to establish an exigency for a warrantless blood draw, and given Officer Shead's testimony that a warrant application alone may have taken over two hours in Philadelphia at the time, the Superior Court's reasoning would appear to permit a determination that exigent circumstances existed automatically, perhaps for all DUI arrests in the City of Philadelphia. This is a conclusion plainly in tension with *McNeely*'s rejection of a *per se* exigency approach.

We are cognizant of the significance of the two-hour period following the accident. The officers', Commonwealth's, and Superior Court's focus upon this time period derives from the DUI statute itself. For alcohol-related offenses based upon a suspect's BAC, the statute requires proof of the suspect's BAC "within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle." 75 Pa.C.S. § 3802(a)(2), 3802(b), 3802(c); *see also id.* § 3802(e) (relating to minors), 3802(f) (relating to commercial or school vehicles).[13] It is undoubtedly true that the

---

[13] Recently, in *Commonwealth v. Starry*, __ A.3d __, 2020 WL 355367 (Pa. 2020), this Court held that the DUI statute does not absolutely require BAC testing within two hours, such that evidence of a suspect's BAC obtained beyond the two-hour window

Commonwealth has a significant interest in obtaining evidence of a suspect's BAC within this time period. This time frame not only relates to a necessary element of certain DUI offenses, but it is, of course, well-understood that the alcohol in a suspect's blood dissipates relatively rapidly through natural metabolic processes, thus diminishing the evidentiary value of a belated test. *See generally McNeely*, *supra*. We are further aware of, and sympathetic to, the potential difficulties that an officer could face in seeking to obtain and execute a search warrant within the two-hour window provided by the statute.[14] These same concerns were a driving factor in the *Birchfield* Court's decision to articulate a categorical exception to the warrant requirement for a powerful evidentiary tool: a breath test.

Simply put, any concern about the time necessary to obtain a search warrant in this context is significantly ameliorated, if not wholly extinguished, by the fact that no search warrant is necessary under the Fourth Amendment to demand that a DUI arrestee perform a breath test. Such a test is a valid search incident to a lawful arrest for DUI, and the arrestee has "no right to refuse it." *Birchfield*, 136 S.Ct. at 2186.

---

nonetheless may be "related back" so as to develop circumstantial evidence of the suspect's BAC during that timeframe.

[14] Although the Commonwealth does not offer such a theory in this case, we note that the DUI statute provides an exception to its "two-hour rule." 75 Pa.C.S. § 3802(g). The exception states that, where BAC is an element of a DUI offense, and BAC evidence is obtained in excess of two hours after the suspect's last operation of the vehicle, the BAC nonetheless will suffice if the Commonwealth "shows good cause explaining why the chemical test sample could not be obtained within two hours" and "establishes that the individual did not imbibe any alcohol or utilize a controlled substance between the time the individual was arrested and the time the sample was obtained." *Id.* § 3802(g)(1)-(2); *but see Starry*, __ A.3d at __; 2020 WL 355367, at *6-7. Rather than allowing the statutory two-hour rule to control the constitutional determination of exigent circumstances, it would be more sensible to suggest that a delay occasioned by the process for obtaining a search warrant for a blood draw constitutes "good cause" for exceeding the statute's two-hour window. We leave open such a theory for a future case.

Unsatisfied with the categorical permissibility of warrantless breath testing, the Commonwealth asserts that Trahey has cited no precedent suggesting that the need for a warrantless blood test must be bolstered by a showing that the police officers "could not have performed a less accurate breathalyzer test." Brief for Commonwealth at 18. To the contrary, the *Birchfield* Court clearly stated that blood tests "are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test." *Birchfield*, 136 S.Ct. at 2184. As for the Commonwealth's contention that breath tests are less accurate than blood tests—an assertion for which it provides no empirical support—its grievance must be directed to the *Birchfield* Court itself, which highlighted the commonality, admissibility, and credibility of breath tests, and held, as a matter of federal constitutional law, that such tests "in most cases amply serve law enforcement interests." *Id.* at 2185.

This brings us to the question, much like the one that the *Birchfield* Court asked, of what law enforcement interest could not be served by a breath test in this case. The Commonwealth asserts that the investigating officers had not only a prerogative, but a "responsibility," to obtain all evidence of potential intoxication, including any controlled substances in Trahey's bloodstream. Brief for Commonwealth at 18. The Commonwealth further argues that it need not show discrete probable cause with respect to controlled substances. *Id.* at 19. The Commonwealth's argument echoes Officer Shead's testimony explaining that the officers chose a blood test in this case because "a Breathalyzer only shows someone's blood alcohol concentration," and does not reveal whether there are "other intoxicants" in the suspect's system, *i.e.*, controlled substances. N.T. at 128.

The Commonwealth does not suggest, however, that the same concerns regarding the rapid dissipation of alcohol in the bloodstream apply to controlled substances. The

timing constraints that animated the decisions in *McNeely*, *Birchfield*, and *Mitchell* all related to the evanescent nature of *alcohol* in a suspect's breath or blood, which deteriorates in a matter of hours. None of those decisions suggested that controlled substances raise the same concerns. Indeed, the DUI statute facially reflects the diminished urgency of testing for controlled substances, inasmuch as its two-hour rule does not apply to the offense of driving under the influence of controlled substances. *See* 75 Pa.C.S. § 3802(d); *Commonwealth v. Wilson*, 101 A.3d 1151, 1156 (Pa. Super. 2014) ("[W]e find that the absence of any such time requirement in subsection 3802(d) [is] persuasive that the legislature did not envision a time limit on testing for the presence of controlled substances after driving."). Moreover, there is no range of permissible concentrations of prohibited substances in a motorist's bloodstream; rather, "any amount" of such a substance in a motorist's system constitutes an offense. 75 Pa.C.S. § 3802(d)(1). This further establishes the absence of a need for testing within two hours. Accordingly, even if a search warrant application were to take the full three hours that Officer Shead posited that it may, there is minimal risk that evidence of controlled substances in the suspect's blood would reduce to a completely undetectable level within that time.

In effect, the Commonwealth asks this Court to conclude that, because there was an urgent need to test for Trahey's blood *alcohol* concentration within two hours—a need that could be satisfied with a breath test—there accordingly were exigent circumstances justifying a warrantless blood test for controlled substances, a category of evidence that does not require testing within two hours.[15] We cannot endorse this conclusion. Exigent

---

[15] Further, this Court's recent decision in *Starry*, *see supra* n.13, undercuts the Commonwealth's assertion of exigency as it relates to the DUI statute's two-hour window. The *Starry* Majority made clear that its relation-back rationale and the good-cause exception are "statutory alternatives made available to the prosecution." *Starry*, \_\_ A.3d at \_\_; 2020 WL 355367, at *6. Accordingly, pursuant to *Starry*, there was no absolute

circumstances are defined by a "compelling need for official action and no time to secure a warrant." *McNeely*, 569 U.S. at 149 (quoting *Tyler*, 436 U.S. at 509)). With regard to alcohol, there is no need for a warrantless blood test because the "less invasive alternative of a breath test" adequately serves the government's interest in obtaining the evidence sought. *Birchfield*, 136 S.Ct. at 2184. With regard to controlled substances, a blood test may be necessary, but there is no pressing need to conduct the test within a specified time, and thus no exigency.[16]

requirement that the investigating officers must have obtained evidence of Trahey's BAC within two hours after his last operation of a vehicle. Rather, upon the execution of a BAC test outside the statutory two-hour window, and even absent a showing of good cause for delay, Trahey's BAC could have been related back to the relevant timeframe, thus diminishing the need for exceptional haste in order to satisfy a rigid timeframe.

[16] The Concurrence expresses concern that we have relied too heavily upon the availability of a breath test in assessing the need for a warrantless blood test, opining that "the two tests are separate and distinct, and access to a breath test does not necessarily affect a warrant application or the applicability of an exception to the warrant requirement for obtaining a blood test." Conc. Op. at 1 (Mundy, J.). This position is flatly contradicted by the language of *Birchfield*, which the Concurrence quotes, but does not reconcile: "Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test." *Birchfield*, 136 S.Ct. at 2184.

Certainly, the Concurrence is correct that breath tests and blood tests are "separate and distinct." Conc. Op. at 1 (Mundy, J.). The *Birchfield* Court's rationale was expressly comparative, viewing the tests in light of "the degree to which they intrude upon an individual's privacy and the degree to which they are needed for the promotion of legitimate governmental interests." *Birchfield*, 136 S.Ct. at 2176 (*quoting Riley*, 573 U.S. at 385 (cleaned up)). The Court unmistakably premised its legal conclusion upon the much greater degree of invasion into protected privacy interests that attends blood testing as compared to breath testing, the latter of which, with regard to BAC detection, is "significantly less intrusive" and "in most cases amply serve[s] law enforcement interests." *Id.* at 2185. This conclusion is markedly amplified by the *Mitchell* plurality's much-repeated emphasis that its exigency determination was premised upon the *unavailability of breath testing* in the unconscious-driver scenario. *See supra* at 21-22 & n.12. Indeed, the Concurrence's suggestion that the availability of one type of test does not impact the permissibility of the other is further contradicted by *Birchfield*, inasmuch as the Court suggested that police officers may need to conduct a blood test "when they have reason to believe that a motorist may be under the influence of some other substance (for

As the suppression court concluded, "[t]his is a case where a Breathalyzer could have been taken." N.T. at 181. Trahey was conscious and sitting in the same room as an Intoxilyzer 8000 breath-testing machine. *Id.* at 23. There was no stated indication that Trahey was under the influence of a controlled substance, but probable cause to suspect non-alcoholic intoxication could have been established if, among any number of potential circumstances, a breath test revealed that alcohol would not explain the degree of Trahey's apparent intoxication. *See Birchfield*, 136 S.Ct. at 2184. Had the investigating officers developed probable cause to suspect the presence of controlled substances in Trahey's blood, they could have obtained a search warrant for a blood draw subject to no timing limitations.

The Superior Court was correct that the exigency analysis is an objective one. *Trahey*, 183 A.3d at 451. However, even disregarding the officers' subjective motivations, or their candid acknowledgment that they would have obtained a search warrant if they thought it necessary, *see* N.T. at 127-28, there was no time-sensitive need to conduct a

---

example, if a breath test indicates that a clearly impaired motorist has little if any alcohol in his blood)." *Birchfield*, 136 S.Ct. at 2184. Thus, *Birchfield* reasoned that not only does the *availability* of a breath test impact the assessment of the need for a blood test, but the *result* of a breath test may as well.

Although the Concurrence highlights that *Birchfield* did not hold that there can *never* be exigent circumstances supporting a warrantless blood draw, Conc. Op. at 2 (Mundy, J.), nor do we so hold. Case-specific showings of exigency under the totality of the circumstances are always available under the Fourth Amendment. But the exigent circumstances doctrine requires the demonstration of a "compelling need for official action" and "no time to secure a warrant." *McNeely*, 569 U.S. at 149 (quoting *Tyler*, 436 U.S. at 509). By weighing the need to obtain a blood sample under the circumstances of this DUI investigation against the evidence to which the search was directed and for which probable cause was obtained, and by viewing that need in light of the less invasive means available to effectuate the search, we have not erred by any means. We have simply applied the reasoning of *Birchfield* and *Mitchell*, and assessed the "reasonableness" of a "significantly more intrusive" warrantless blood draw "in light of the availability of the less invasive alternative of a breath test." *Birchfield*, 136 S.Ct. at 2184.

warrantless blood test under the circumstances of this case. Accordingly, the Superior Court's conclusion that the test was justified by exigent circumstances was drawn in error.

The order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this Opinion.

Justices Baer, Todd, Donohue and Dougherty join the opinion.

Justice Mundy files a concurring opinion in which Chief Justice Saylor joins.